No. 19,963.

DRUSILLA PYLES, as Administratrix, etc., *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

1. WRONGFUL DEATH—*Contributory Negligence — Inconsistent Findings.* In an action for wrongful death, under the federal employer's liability act, a general verdict for the plaintiff must be set aside where the jury declares in one finding that the accident would have happened even if the decedent had not been negligent, and in another that his negligence contributed to it, no deduction from the amount allowed appearing to have been made on that account.

2. SAME — *Rule of Railroad Company — Switch Yards — Approaching Trains—Duty of Employees.* A rule of a railroad company that at certain places all trains and engines will have the right to work within yard limits regardless of extra trains, but will give way as soon as possible upon their approach, and that such trains must approach yard limits under control, the responsibility for accident at such points resting upon them, does not place a duty upon employees in charge of a switch engine working upon the main track at a station to withdraw therefrom immediately upon notice of the approach of an extra train at some distance.

3. SAME—*Duty of Employees in Charge of Switch Engine.* Such a rule, however, does not exempt the employees in charge of the switch engine from taking any precautions to avoid collision with an approaching extra that may, in view of all the circumstances, be necessary to the exercise of reasonable care.

4. SAME. Whether such a rule by itself constitutes a sufficient means for protecting the crew of an incoming extra from collision is ordinarily a question of fact.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed March 11, 1916. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott, Harlow Hurley,* all of Topeka, and *J. E. Torrance,* of Winfield, for the appellant.

*Alfred M. Jackson, Albert L. Noble,* both of Winfield, and *William A. Ayres,* of Wichita, for the appellee. .

The opinion of the court was delivered by

MASON, J.: Walter Pyles, the engineer of an incoming extra freight train, was killed in a collision with a switch engine, attached to a number of box cars, at work in the yards of the Santa Fe company, at South Winfield. Under the federal employer's liability act his widow recovered a judgment for $12,000 against the company, and it appeals.

The defendant maintains that the accident was the result solely of the negligence of the decedent in passing the yard limits without having his train under control, contrary to the rules of the company. The petition alleged various forms of negligence, but the basis of liability adopted by the jury was the failure of the switching crew to keep out of the way of the incoming train.

These facts are covered by the special findings, or shown by evidence which is not disputed: The track from the South Winfield station runs somewhat east of south; at about a thousand feet from the station it curves to the east for a like distance, and then maintains a steady curve to the west until it crosses the Walnut river, just south of which it curves back to the east, before again making a turn to the west. The house track switch, near which the yard crew were working when the accident occurred, is about half a mile south of the station. The collision took place some 900 feet south of the switch. The north end of the bridge over the river is 1315 feet further to the south, and the yard limits 655 feet beyond that. The wreck occurred between nine and ten o'clock on a dark and rainy night. Shortly before it took place the switch

Pyles v. Railway Co.

engine was at the station, running backward and drawing twenty-two cars, some of which were to be placed on the house track. While the switching crew were at the station they saw the reflection in the sky of the electric headlight of the extra freight approaching from the south. The foreman told the switchman whose duty it was to "follow the engine" to stay on the footboard at its south end and hold up the incoming train until the cars were placed on the sidetrack. They pulled down to the switch at the rate of six to eight miles an hour. The switchman referred to saw the headlight of the freight train just before it reached the bridge. As it was coming over the bridge he swung his lantern across the track as a signal for it to stop, the distance between them at this time being about 1500 feet, although he estimated it at a half mile. He received an answer—two short whistles. He then dropped off his engine and walked out a little ways from the track, so that he could see his own engineer and the other switchman (called the "man in the field"), and gave his engineer a signal to stop. His engineer then "whistled out a flag," that is, signaled him to flag the incoming train again. He did so, but it was too late. The train was coming down grade; it was not under control when it passed the yard limits, but was running twenty-five to thirty miles an hour; it still had a speed of fifteen to eighteen miles when the collision occurred. The switch engine had about come to a stop. It carried an oil headlight at its south end. Evidence given at a former trial by the head brakeman of the freight train was introduced, to the effect that as the engine passed over the bridge he heard the fireman say he could see something ahead, but he didn't know whether it was in the clear.

(1) The jury returned an affirmative answer to the question: "If the deceased, Walter Pyles, had had his engine and train under control, as required by the rules, when he entered the yard limits at South Winfield on April 1, 1912, would the accident have happened?" This finding, among others, is attacked by the defendant as without support in the evidence. "Under control" was defined by the rules as meaning—"ability to stop a train within the distance track is seen to be clear." Inasmuch as the switchman's flag, or signal made by swinging his lantern across the track, given while the incoming train

was on the bridge, something over 1500 feet away, was seen by the engine crew (as shown by the answering whistle) it seems clear that if the train had been even then under control the collision would have been prevented. Moreover the jury also answered affirmatively the question: "Did the negligence of the deceased contribute in any degree to the accident which caused his death?" The two findings, in view of the whole situation, are in absolute conflict—they can not be reconciled. Nor can it be ascertained upon which of them the jury acted. Whether any deduction from the amount of the verdict which would otherwise have been returned was made on account of the negligence of the decedent is not disclosed by the record, no question on that subject having been submitted. This conflict in the findings upon a vital point in the case requires the setting aside of the verdict.

(2) The defendant maintains that upon the evidence and findings judgment should be ordered against the plaintiff, on the ground that they show the accident to have resulted solely from the negligence of the decedent, no other employee of the company having been at fault. The decision of this question turns in part upon the construction and application of a rule reading as follows, particularly with respect to the phrase here italicized:

"Stations having yard limits will be designated in special rule in time-table. [South Winfield was one of the stations so designated.] All trains and engines will have the right to work within such yard limits regardless of second or third-class trains or extras, but will give way *as soon as possible* upon their approach. All except first-class trains will approach yard limits under control, and responsibility for accident at such points will rest with the approaching trains."

As the defendant interprets the rule, the approaching train having been an extra, the switching crew were under no duty to keep out of its way for the purpose of avoiding a collision; the requirement that they should give way "as soon as possible" meaning merely that they should be diligent in getting out of the way in order not to delay traffic more than was necessary. The plaintiff, however, insists that inasmuch as those in charge of the switch engine, while they were still at the station, saw the reflection of the headlight of the approaching train and knew that it would arrive shortly, the rule made it their duty to get off the main line immediately, leaving a

clear track for the freight, and that their negligent omission to do so was at least a contributing cause of the wreck, rendering the company liable. Up to this point we concur in the view of the defendant. Upon the entrance of an extra into a yard where switching is being done, the primary duty of avoiding a collision is cast upon its engineer, who is required to have his train under control, in order that if any obstacle is seen he may stop before it is reached. (*Central R. Co. of New Jersey v. Young,* 200 Fed. 359; *Rosney v. Erie R. Co.,* 135 Fed. 311.) The switching crew is given the right to work regardless of such a train, but must give way as soon as possible in order not to make unnecessary delay. The crew at work in the yard are not required, in order to make a collision impossible, to withdraw from the main track the instant they learn of the approach of an extra, at any distance. The instructions embodied substantially this view, the jury being told that the employees at work in the yard had a right to assume that the train would come in under control, and to act accordingly, until they had some notice to the contrary.

(3) On the other hand, the rule can not be regarded as exempting the switching crew from taking any precautions to avoid a collision that under all the circumstances would constitute an exercise of reasonable care. Such a construction would render it unreasonable and void. (*Chicago, Rock Island Ry. v. Wright,* 239 U. S. 548; *Southern Ry. Co. v. Craig,* 113 Fed. 76.) The jury found specially that the liability of the defendant was based upon the negligence of the switching crew in not getting off the track on the approach of the train; that under the rules they had no right on the main track because they had notice of the approaching extra by the reflection of its headlight. These findings indicate the adoption of the theory that the switch engine should have been sidetracked as soon as the reflection of the headlight of the train was seen in the distance. But the jury also found that when the engine of the train was on the bridge its rate of speed showed the switching crew that its engineer was not going to obey the rule. An instruction was given that from the time the employees had notice of this fact it was their duty to exercise ordinary care to avoid a collision. This is objected to on the ground that it was conclusively shown that they had no such knowledge until

it was too late to prevent the catastrophe. We think under all the evidence it was a fair question for the jury whether in the exercise of reasonable prudence the switching crew could not have anticipated that the engineer might, in the darkness and fog, inadvertently run past the yard limit without reducing speed, and whether, after the train was near enough so that its speed could be ascertained, they could not have backed away from it in time to prevent the accident or materially lessen the consequent injury. These considerations preclude a judgment for the defendant at this time.

(4) The defendant complains of an instruction reading as follows:

"It was the duty of the Railway Company . . . to provide suitable means whereby those managing trains may have notice of switch engines and trains upon its tracks in such positions as are likely to be dangerous to such employees, and to exercise ordinary care in order not to place such switch engine or other obstructions upon its tracks without such notice, in such a position as to be likely to endanger those engaged in managing other engines or trains."

It argues that the rule already quoted was the means provided for the end indicated; and that therefore an instruction given elsewhere, that the rules introduced in evidence were "reasonable and sufficient," amounted to a statement that sufficient means had been adopted to advise the crews of incoming trains of the presence of engines and cars on the track. The argument gives too much scope to the word "sufficient," which must be taken to mean sufficient for the particular and limited purpose to which the rule was directed—not sufficient to cover the whole field and give all the protection needed by those for whose benefit it was promulgated. There was some evidence from which an inference might be drawn that the deceased engineer, being unfamiliar with the run, and unable by reason of the weather to tell when he had reached the yard limits, passed them at a high speed without knowing it. Whether the rules gave all the protection reasonably needed to meet a situation of that kind was a fair jury question.

The judgment is reversed and the cause remanded for a new trial.