**PAYNE, Agent, v. WYNNE.	(No. 2428.)**

(Court of Civil Appeals of Texas. Texarkana. June 25, 1921. Rehearing Denied July 2, 1921.)

1. **Commerce ⬅27(5) — Test as to whether employee was engaged in "interstate commerce" at time of injury stated.**

The test as to whether an employee was engaged in interstate commerce, within the Federal Employers' Liability Act, at the time of the injury, is whether he was at such time engaged in interstate transportation, or any work so closely related to it as to be practically a part of it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. **Commerce ⬅27(8)—Locomotive repairer held not engaged in "interstate commerce" at time of injury.**

Railroad employee injured while engaged in the repair of an engine which had been placed in the roundhouse for repairs after having finished its round trip, to remain in the roundhouse until completion of the work of repairing, *held* not engaged in "interstate commerce" at the time of the injury, within the Federal Employers' Liability Act, though the locomotive had been used in both interstate and intrastate commerce before being placed in the roundhouse for repairs, and although it was similarly used after the repairs had been completed.

Levy, J., dissenting.

Appeal from District Court, Smith County; J. R. Warren, Judge.

Suit by Carrie Wynne, administratrix, against John Barton Payne, Agent. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

As temporary administratrix of the estate of R. F. Wynne, deceased, the appellee brought the suit to recover damages for the benefit of the minor sister of the deceased,

as next of kin dependent upon him, for the alleged negligent death of R. F. Wynne. R. F. Wynne, 35 years old, was killed April 24, 1919, while assisting in repairing engine No. 560 in the roundhouse of the railway company at Tyler, Tex. He was a carman's helper, and was assigned as assistant in making repairs on the tank or tender and the framework of locomotives. He and his coemployee were engaged at the time of injury in suit in raising the front of the tender or tank of engine 560 in order to make certain needed "light or running repairs" of the tender or tank. The engine part had been cut loose or detached from the tender or tank and backed away. They used two hydraulic jacks to raise the front end of the tender or tank. While R. F. Wynne was under the tank or tender engaged in placing a block on the trucks of the tender to let the tank rest on it while the repairing was being done, one of the jacks suddenly gave way or went down, and the tank fell towards deceased and on his head, killing him instantly. The jack was not in safe repair and was defective, and leaked so as to impair its power to sustain weight.

Plaintiff's petition alleged that the Director General of Railroads was engaged in interstate commerce at the time of the death of deceased, and that the deceased, as an employee of the Director General, engaged in making the repairs, was also engaged in interstate commerce. The ground of this contention was that the engine was used in interstate commerce at the time of the death of deceased. And continuing, the petition alleged:

"When the deceased was injured and killed the defendant, as a common carrier by railroad, was engaged in commerce between different states, and the deceased was employed by the defendant, and as such employee was engaged in such interstate commerce, in that the locomotive and tender, the latter of which deceased was engaged in repairing at the time he was killed, was at the time of said injury, and long theretofore had been, assigned to, and was regularly and constantly used and employed by, the defendant in hauling, over the road of the said St. Louis Southwestern Railway Company of Texas, freight trains, cars, and shipments of freight originating in Texas and en route to and destined to other states, and also trains, cars, and shipments of freight en route to and destined to points in Texas from other states, and in that at the time of the said fatal injury the said locomotive and tender were only temporarily in the roundhouse of the said railway company, and remained there for a few days only, for the purpose of being repaired; and while said repairs were being made, so that the tender and engine could be, as the same was, again at once used by the defendant in hauling or pulling such interstate cars and freight; and in that at the time of the deceased's death he was engaged in repairing the tender of said locomotive for the purpose of said engine and tender being used at once by the defendant in hauling such interstate freight, and that said locomotive and tender were regularly assigned to, and regularly and constantly used by, the defendant in hauling such interstate freight, both before and after the said repairs were made."

The defendant answered by (1) a general denial, and (2) specially pleaded—

"that at the time R. F. Wynne was killed he was not engaged in either interstate or intrastate commerce, but was engaged in repairing, in defendant's machine shops in the city of Tyler, an engine that had been used, prior to the time that it was put in defendant's shop for repairs, in hauling of freight trains over the railway of the St. Louis Southwestern Railway Company of Texas, and which trains hauled both interstate and intrastate commerce, and at other times only intrastate commerce; and after it had been repaired in defendant's shops, subsequent to the death of said Wynne, it was so used in the hauling of freight trains over said railway; that said engine had never been before the death of said Wynne, and has never been since his death, permanently devoted to the transporting alone of interstate cars, but was used for such business as it might be needed for;"

—and (3) contributory negligence, and (4) assumed risk.

The case was tried before a jury on special issues, and their findings were (1) that the jack in question was not in reasonably safe repair or condition to be used in making the repairs on the tender; (2) that it was negligence on the part of the defendant in furnishing the deceased the jack, in the condition it was in, to do the repairing required; (3) that such negligence was the proximate cause of the injury to the death of the deceased; (4) that the injury to the deceased was not the result of an accident; (5) that the deceased was not guilty of contributory negligence; (6) that the deceased did not assume the risk of being injured by the condition of the jack; and (7) that the beneficiary was dependent on the deceased at the time of his death. The jury also made a finding as to the amount of damages. There is evidence to support these findings of fact, and they are here adopted as the facts of the appeal, without making further statement of the evidence on any of those issues.

The St. Louis Southwestern Railway Company of Texas, the railway in question, is a Texas corporation, and its general offices, roundhouses, and machine shops are located at Tyler, Tex. Tyler is the end of three divisions of the road in Texas—from Tyler to Waco, from Tyler to Lufkin, and from Tyler over the Fort Worth Division to Mount Pleasant and Texarkana, Tex. The state line between the states of Texas and Arkansas runs through and divides the city of Texarkana. This line of railroad extends to the state line of Texarkana, and there

makes physical connection with the railroad of the St. Louis Southwestern Railway Company, an Arkansas corporation. As testified:

"The other connections which the St. Louis Southwestern Railway Company of Texas has at Texarkana are the Kansas City Southern, the Missouri Pacific, or Iron Mountain, as it is called."

The said two St. Louis Southwestern railways are called "the Cotton Belt System." As testified:

"The Cotton Belt Railroad in Texas is a part of a system of railroads. This Cotton Belt System extends into the states of Arkansas, Texas, and Missouri. Texarkana is the connecting point between the Cotton Belt System in Texas and the Cotton Belt System north of Texas. * * * In handling cars of freight destined to points in Arkansas, Missouri, and the north and east over the Cotton Belt Railway, it is at Texarkana that the Cotton Belt would deliver them to its other part of the system; and it is at Texarkana that freight cars coming into Texas over the Cotton Belt System from Arkansas, Missouri, and other points north and east would be delivered to the Cotton Belt of Texas."

And, quoting from the witness:

"Under the system in operation on the Cotton Belt (the railroad in controversy) the engines are assigned to through freights or to local freights. What is meant by that is that an engine pulling a freight train would be assigned, for instance, to pull through freight trains or it would be assigned to pull local freight trains. * * * The difference between a through freight train and a local freight train is that a local freight train picks up and sets out loads at different stations on the line, and a through freight train pulls cars from one terminal to the other; that is, where they are loaded with freight moving out of the state or moving from one point in the state to another."

It was then proven that engine No. 560, the one in question, was one of the largest types of freight engines in use on this railroad. Engines of the 560 class, 2 as the witness said,

"are usually given to the handling of freight trains, and to the handling of through freight trains. In an occasional emergency they sometimes handle some other class of freight trains; in an occasional emergency they handle any train that might be necessary to be handled; in other words, they are usually applied to the handling of those through freight trains, but when necessary they are applied to other purposes. If we have cars of freight destined to points outside of Texas, then those cars, as a rule, are pulled in the through freight trains. Smaller type or smaller size engines than this 560 were set aside or used regularly or ordinarily in the local freight-train service."

On cross-examination the witness was asked the following question:

"Q. Now are there any locomotives on the Cotton Belt that are used exclusively for pulling cars destined from the state out of the state, and from out of the state in the state—interstate commerce?

"Ans. No; there are no particular locomotives that are set aside for the pulling of interstate commerce; in other words, the locomotives are used to pull indiscriminately interstate and intrastate commerce. There are not any trains that are used for pulling exclusively interstate commerce or intrastate commerce, and this locomotive in question, 560, was not set aside for that particular purpose, but it was used indiscriminately in pulling interstate or intrastate commerce."

On direct examination the witness said:

"Yes; 560 was set aside and used regularly in pulling through freight trains. I said in answer to the attorney that in case of emergency it might be then called out and used for some other freight service besides the through freight service, but its regular use to which it is put or set aside is the handling of through freight trains."

And the witness Haley testified:

"This engine (560) had been used in the hauling of freight trains for some time before the death of Wynne, and mostly, if not altogether, in hauling through freight shipped into and out of Texas from and to other states. It was used in hauling through freight, but I do not know what trip it had last made before it was placed in the roundhouse for this particular repair. I don't know how long it remained in the roundhouse before it went on the road again. I don't know what service it was used in when it went out on the road again the first time after Wynne's death, as to whether used to haul a passenger or freight train, local or through freight to another state. * * * I don't know as to any part of this matter, except that the engines move such freight as the company has to haul."

"The company," it appears,

"has a roundhouse and machine shops at Tyler, and is prepared to make running repairs on engines and cars and other rolling stock at Tyler. Tyler is a division point. Tyler is the home terminal of the locomotive engines that pull the freight trains."

And it was then proven that Engine No. 560, hauling a train of 26 cars, reached Tyler, Tex., the home terminal of the engine, at 3:30 o'clock a. m., April 23, 1919, and was billed to the roundhouse for repairs at, according to the records of the roundhouse foreman, "3:40 o'clock a. m., April 23, 1919." According to the official train record of that particular train movement, engine 560 was, at the time of reaching the end of its run at Tyler, hauling a through freight train consisting of fourteen carloads of intrastate freight, and twelve carloads of freight originating in Texas and destined to points in other states. Deceased was killed in the afternoon of April 24, 1919, while assisting in making repairs on engine 560 at the time it was in the roundhouse. The repairs on

this engine were completed, and it was marked "O. K., ready for service," at 6 o'clock p. m., April 26, 1919. At 9:30 o'clock a. m. of April 27, 1919, engine 560 left Tyler, Tex., pulling an outgoing through freight train to Texarkana, consisting of 24 loaded cars and 3 empty cars. The train record shows that 10 of the cars were loaded with freight originating in Texas and destined to points in other states; some of the other 14 cars, the number not stated, were loaded with intrastate freight, and the destination of the remaining cars was not shown.

The plaintiff introduced the train record of the operation and movement of engine 560 from April 1, 1919, prior to the death of Mr. Wynne, to June 1, 1919, a period of 60 days, showing the trips or runs made by the engine, the train pulled, and the character of the freight hauled. This train record constitutes all the evidence offered in the trial as to the operations and movements of engine 560; and, in the absence of any evidence to the contrary, it is presumed in point of fact that this engine was assigned and used only in pulling through freight trains. The train records showed that on each and every trip during the period of time mentioned engine 560 pulled a freight train containing cars loaded with intrastate and cars loaded with interstate freight, unless as to the following:

"May 1, 1919. Engine 560, Conductor Stevens, into Tyler 9:50 p. m. from Texarkana. Train load 35 empty box cars moving from Texarkana to Tyler."

"May 27, 1919. Engine 560, extra, Conductor Akers, arriving Tyler 10 a. m. from Texarkana. Train load 34 empty refrigerator cars. Moving Texarkana to Tyler, and one carload hay from Boston, Texas, to Lufkin, Texas."

The agent of appellant, testifying from the company's train records above stated, said:

"These are the only instances in which, from the records, I find trips made by engine 560 within the dates mentioned in which there was not in the train pulled by that engine interstate commerce. Now, recapitulating and going over my evidence of the in-bound trains into Tyler, and the records we examined here the other day and these records here now, I don't think I find, with two possible exceptions, that is, a train load of refrigerator cars to Lufkin, and a load of empty box cars to Texarkana, any trips made by engine 560 in which there was not in the train pulled by that engine interstate commerce, within the dates mentioned, that is, April 1 to June 1, 1919, and from my recollection of the records that we went through the other day I don't think that we find that there was a train that moved into Tyler without an interstate shipment in it; and these records of out-bound trains all show interstate shipments in the train, with the possible exception of the two instances just spoken of. * * * Each one of those trains also contained intrastate shipments or intrastate cars; each train contained intrastate as well as interstate shipments or cars during the time inquired about, and pulled by engine 560."

And as to the above train of May 27 the same witness, continuing, said:

"On May 27, 1919, that train was extra. That train consisted of a train load of empty refrigerator cars. I traced all of those cars to see whether or not there was any portion of the train of empty refrigerator cars that came from Texarkana to Tyler; that is what I made these records from, the in-bound records, to get the out-bound movements. These empty refrigerator cars were distributed between Tyler and Lufkin at various sidings for storage. Those places at which they were distributed were the places from which, at that season of the year, they were shipping berries or tomatoes. The principal part of those shipments of refrigerator cars from those points on the Lufkin branch were made to interstate points—the principal portion of them were made to interstate points, that is, to points outside of Texas."

The evidence therefore justified the finding of fact, involved in the judgment of the trial court, that (1) the railroad company in question was regularly engaged as a common carrier of interstate commerce as well as of intrastate commerce; and (2) such railroad company regularly and uniformly actually used engine 560, in controversy, both before and after the injury in suit, in hauling through freight trains over its road, and that each of these through freight trains hauled by this engine, with the exception of one train on May 1, 1919, was composed of cars moving interstate commerce and of cars moving intrastate commerce; and (3) such railroad company maintained at Tyler, Tex., its general machine shops and a roundhouse, and there made repairs and "running repairs" on its engines, cars, and other rolling stock; and (4) the deceased was an employee of such railroad company in the roundhouse at Tyler, Tex., assigned to the work of assistant or helper in making repairs on the tender and framework of engines; and (5) engine 560, on which deceased was working at the moment of his death, was, immediately after completing its usual round trip from Tyler, Tex., to Texarkana, Tex., of April 23, 1919, placed temporarily in the roundhouse for "running repairs" to make it safe for service on the road.

Marsh & McIlwaine, of Tyler, for appellant.

Johnson, Edwards & Hughes, of Tyler, for appellee.

LEVY, J. (after stating the facts as above). The appellant requested and the court refused to give a peremptory instruction to the jury to return a verdict for the defendant. The court instructed the jury, as a matter of law, that the character of service the de-

ceased was employed in at the time of his injury was interstate commerce. Error is predicated upon the ruling of the court, upon the ground that—

"there was no evidence that deceased, R. F. Wynne, at the time he received the injury that resulted in his death, was then employed in interstate commerce within the meaning of the Federal Employers' Liability Act of April 22, 1908, governing the liability of an interstate carrier for injury to its employees while employed in interstate commerce; but all the evidence showing, and there being no evidence otherwise showing, that he was at the time engaged in making repairs in the roundhouse upon an engine which had been used in hauling over the railroad company's lines freight trains carrying both intrastate and interstate freight, and which was used in the same way after the accident."

The question for decision is one of pure law, it is believed, of the legal effect attaching to the facts of this case. It is clearly and fully established from the evidence that engine 560, on which deceased at the very moment of his death, in the afternoon of April 24, 1919, was working in the regular course of his employment, (1) was actually used, regularly and uniformly, between terminal points in the state of Texas, in moving through freight trains containing interstate as well as intrastate commerce, and was not exclusively used in moving trains containing intrastate commerce, up to the time it was taken to the roundhouse; and (2) was placed in the roundhouse in Tyler, Tex., for purposes of repair, at 3:40 o'clock a. m., April 23, 1919, after it had reached its terminal station at Tyler, Tex., and had finished its round trip of the day, and remained there in the roundhouse until 6 o'clock p. m., April 26, 1919, when the repairs were completed, and it was then marked "O. K., ready for service," and (3) at 9:30 o'clock a. m., April 27, 1919, actually began to move in its trip from Tyler, Tex., to Texarkana, Tex., hauling cars containing both interstate and intrastate commerce; and (4) was actually used, regularly and uniformly, between points in Texas, in hauling through freight trains containing interstate as well as intrastate freight, and not used exclusively in hauling intrastate freight, after the repairs were made on it. In this connection it further appears that while Tyler, Tex., was the home terminal of engine 560, and it had ended its customary state trip at that place, the journey of the usual interstate shipments it pulled did not end at Tyler, Tex., but were regularly further forwarded in through freight trains to their destination, drawn by other engines likewise used as engine 560 between points in the state. The controlling questions, then, arising for determination, are: (1) Does the fact that the engine was regularly and uniformly used between points in the state of Texas in hauling commerce destined to points in another state, and not exclusively used in hauling intrastate commerce, before and after the injury, entitle the employee performing and injured in repair work in connection with the engine to the benefit of the provision of the federal act (Act April 22, 1908 [U. S. Comp. St. §§ 8657–8665]), although at the time of its repair the engine finished its round trip and reached its final destination, and was not to go out on its next trip hauling interstate freight until such indefinite time as the works of repair might be finished? Or (2) does the particular fact that the engine had finished its round trip and finally reached its regular terminal station, and was then placed in the roundhouse for purposes of repair, to remain there until such time as the work of repairing might be finished, affirmatively show that the employee performing and injured in the repair work on the engine is not entitled to the provisions of the federal act?

[1] The test of "employment in such service," under the federal act in question, as stated by the United States Supreme Court, is:

"Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it?" Shanks v. Ry. Co., 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797; Ry. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941.

And applying this test, the Supreme Court has plainly decided that an employee is entitled to the provisions of the act when injured by reason of the work of "repairing" or "operating" or performing duties connected with cars, engines, bridges, tracks, and pumping stations of railroads, because the work so done is indispensable, and so closely related to "interstate transportation" as to constitute it, in practice and legal effect, a part of it, provided the evidence affirmatively shows such instruments or employment are in actual use or service in the transportation of interstate commerce at the given time of "the injury" suffered by the employee. Pedersen v. Ry. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153; Ry. Co. v. Collins, 253 U. S. 77, 40 Sup. Ct. 450, 64 L. Ed. 790; Ry. Co. v. Wright, 239 U. S. 548, 36 Sup. Ct. 185, 60 L. Ed. 431; Ry. Co. v. Otos, 239 U. S. 349, 36 Sup. Ct. 124, 60 L. Ed. 322; Ry Co. v. Bower, 241 U. S. 470, 36 Sup. Ct. 624, 60 L. Ed. 1107; Ry. Co. v. Zachary, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159; Ry. Co. v. Delk, 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 591. And unless the evidence affirmatively shows that the instrument, at the given time of "the injury" suffered by the employee, is in actual use in "interstate transportation," the test laid

down is not met and the act does not apply to the case. Ry. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941; Ry. Co. v. Yurkonis, 238 U. S. 439, 35 Sup. Ct. 902, 59 L. Ed. 1397; Ry. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163. And, further, the intention to use, and the purpose to do, after the injury, viewed from "the time of the injury," are "remote probabilities" or "accidental later events," not having direct relation to the actual use of the instrument or service of employment at the time of the injury. For, as stated in the Behrens and Yurkonis Cases, supra.

"The mere fact that the coal might be, or was intended to be, used in the conduct of interstate commerce after the same was mined and transported" is immaterial under the statute; and "that he [the injured employee] was expected, upon the completion of that task, to engage in another, which would have been a part of interstate commerce," did not make the injury one received by the plaintiff while he was engaged in interstate commerce.

In the cases of Pedersen and Collins, supra, it was said that a bridge, track, or pumping station regularly used as an instrumentality of interstate commerce is employed in interstate transportation at the time the repairs are commenced or work done; such instrumentalities, in their very nature, are assigned to interstate commerce; and there is no distinct or separable interval or given time in which they could be devoted to intrastate commerce or to no commerce at all. They are fixtures permanently devoted, and can be so, to actual use in interstate commerce, and impossible of "use exclusively" in intrastate traffic so long as the railroad is hauling interstate commerce at all. They are never out of use for interstate commerce. A bridge, like the railroad of which it is a component part, is permanently and immediately there in readiness for its next regular and customary use of trains to pass over it, in orderly and schedule time, containing interstate commerce. But the actual relation and connection that railroad bridges and like fixtures have to interstate transportation are not similar and entirely like that of "cars" and "engines" at the given time of "the injury" to the employee. "Cars" and "engines," unlike fixtures, are ambulatory and capable of "movement," and can be only assigned to, or have connection with, "transportation" of persons and property that is "interstate" in its character by means of trips or journeys hauling or moving such commerce. They can be used "exclusively," either regularly or occasionally, in intrastate commerce; and, unlike a bridge or track, an engine or car can terminate and finish each of its regular trips. When the particular trip hauling interstate freight is finished, and it has reached its destination, then whether it goes out on another trip, or ever goes again in interstate transportation, is entirely dependent upon the subsequent purpose and intention of the company in respect thereto. Its daily work is, in a way, like that of an employee. After an employee of the railroad assigned to interstate work has finished his day's work and has left the premises, he is not engaged in interstate commerce, within the meaning of the act, in the interval until he has returned to the premises and his usual work. And it was because of the evident differences in the actual relation of the two kinds of instrumentalities to interstate commerce at the time of the injury that, in the case of Ry. Co. v. Winters, 242 U. S. 353, 37 Sup. Ct. 170, 61 L. Ed. 358, Ann. Cas. 1918B, 54, the Pedersen Case, supra, was distinguished on the facts by the language of the opinion, viz.:

"This [referring to the state of facts proven in the case concerning the use of the engine] is not like the matter of repairs upon a road permanently devoted to commerce among the states."

[2] And it is thought by a majority of this court that the Winters Case, supra, rules the instant case, in their view that is here now given. In the Winters Case, as in the instant case, the injured employee was engaged in making "repairs" in the roundhouse upon "an engine." The engine, before the injury, "had been used in the hauling of freight trains over the defendant's line of road," and "which freight trains hauled both intrastate and interstate commerce," and "it was so used after the plaintiff's injury." It was specifically shown both that the engine was in the roundhouse for repairs only at a time between October 18 and October 21, about three days, and that at the time the engine was placed in the roundhouse it had just finished its trip to Marshalltown, pulling a freight train carrying both interstate and intrastate freight, and the first time it was used after the injury on October 21 it pulled a freight train carrying both interstate and intrastate freight out of Marshalltown. Also see the case in 126 Minn. 260, 148 N. W. 106. The United States Supreme Court held that the facts proven were "not sufficient to bring the case under the act." The ruling was one of pure law, of the legal effect attaching to the facts proven. As outlined by the court, "it does not appear that this engine" (1) "was destined especially to anything more definite than such business as it might be needed for," and (2) "it was not interrupted in an interstate haul to be repaired and go on," and (3) "had not yet begun upon any other interstate business," and (4) "at the moment it was not engaged in either" traffic. The ruling was made notwithstanding the fact appeared affirmatively that the engine on the last trip before re-

pairs, and on the first trip after the injury, was actually used in interstate transportation. The court seemed significantly to observe in respect to such proof of "actual use" of the engine that "it had simply finished some interstate business, and had not yet," meaning at the time of the injury, "begun upon any other." And the court finally and plainly stated that—

"its character as an instrument of commerce depended on its employment at the time, not upon remote probabilities or upon accidental later events."

The effect, it is evident, of the ruling is that the evidence respecting the "actual use" of the engine in interstate transportation, both before and after the time it was put in the roundhouse for repairs, could not be legally construed as relating and applicable to "the time of injury," in face of and notwithstanding the affirmative fact that the engine had finished its trip and was in the roundhouse, out of any service in commerce, although temporarily so merely for the purpose of repairs. It is thought the Winters Case was so considered in Ry. Co. v. Collins, supra. It is manifest, we believe, that the court did not mean to suggest, and to have the opinion construed as holding, that if the evidence had shown a more constant and regular use of the engine in hauling interstate freight, or was not in "exclusive" intrastate service, that then in that event such evidence of "use" would have changed the ruling. It is thought that the opinion in that case broadly held, and intended to so hold, that an engine can be assigned to interstate commerce only through means of special trip movements, and, as the engine in that case had finished its round trip and reached its final destination and was placed in the roundhouse, out of any service in commerce, although temporarily so merely for purposes of repair, that legally it conclusively appeared as a fact that the engine was not in movement or readiness to move in "interstate transportation," within the meaning of that term, at and during the time the repairs in the roundhouse were being made upon it, and therefore the case was not within the terms of the law showing injury at the precise time "while engaged in interstate transportation." As an engine can only, as there held, be assigned to interstate commerce by means of special trip movement hauling interstate commerce, then this ruling was in accordance with the other decisions of that court in laying down the rule to trace the point of beginning, continuance, and termination of a trip or journey of engines and cars in "interstate transportation."

As the instant case is ruled by the law of the Winters Case, in our view it is concluded that the judgment should be reversed, and judgment here rendered in favor of the appellant, with costs of appeal and of the trial court. Otherwise the judgment should be affirmed.

The writer, though, does not agree in, and dissents from, the conclusion of the majority of the court that the legal effect attaching to the facts is not to entitle the plaintiff to the provision of the act. We do not disagree that the evidence shows in point of fact that the engine at the time it was placed in the roundhouse for repairs was regularly used in pulling through freight trains containing both intrastate and interstate commerce, and had finished the particular round trip in road service hauling interstate commerce.

The Winters Case is, I think, different from and does not rule the instant case, in that the engine in the instant case was assigned to and regularly used in, pulling through freight trains in interstate transportation of commerce to the time it was placed in the roundhouse for repairs. In the Winters Case the court construed the evidence as a whole, as showing that the engine was not as a fact assigned to regular use in hauling interstate freight, but used in special trip movements in hauling interstate freight, and consequently the fact of its relation or nonrelation to interstate commerce at the time of the injury was dependent upon mere trip movements. And as the engine there did not, under the proof, come within the test of mere trip movements, which is that of actual movement or readiness therefor on the road at the time in hauling cars containing interstate commerce, the court concluded that the facts proven were "not sufficient to bring the case under the act."

The decisions supra, under which is formulated the test mentioned above laid down by the United States Supreme Court, define when and how far a given instrument used in railway transportation is connected with and can be assigned to interstate commerce, which is, as to "cars" and "engines," (1) when the engine or car is assigned to regular use in hauling interstate freight; or, (2) if not assigned to regular use in hauling interstate commerce, then when assigned to use in any special trip or occasion, and in actual movement or readiness therefor, in hauling interstate freight at the time of the injury to the employee; or (3) in actual transit or readiness therefor at the time of the injury, between two states. The term, as used in the test, "engaged in interstate transportation," is not construed, as to "cars" and "engines," by the Supreme Court broadly to relate and have reference, and consequently of application in every case alike, only to actual trip movement or readiness therefor in hauling interstate freight. The term signifies, as construed, the business of interstate commerce and the connection or relation of the engine or car thereto, either regularly or in,

special instances. And the simple question in each case left open for determination is that of whether or not the particular instrument or employment in point of fact comes within one· of the three groups above mentioned, and, if so, which one. If, for instance, the particular engine or car in point of fact comes within group 2 above, of assignment to use in a special trip movement in hauling interstate commerce, then such engine or car has connection or relation to interstate commerce if there were a beginning, continuance, and no termination of the trip in "interstate transportation." Likewise, if the particular engine or car in point of fact comes within group 1, of assignment to regular use in hauling through freight trains containing interstate commerce, and there is such regular use, then such engine or car has connection or relation to interstate commerce. The holding that a "car" or an "engine" can be assigned to interstate commerce, and is so assigned when set aside and regularly used in interstate transportation, is authorized by the "dining car" case of Johnson v. Southern Pac. R. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. It is clear from both the Pedersen and the Collins Cases, supra, that a railroad bridge, track, or pumping station can be devoted regularly to the transportation of interstate commerce. The "dual uses" in the two branches of commerce do not necessarily make a bridge, track, or pumping station any the less instrumentalities in interstate commerce, because, in their very nature, there is no sufficient definite and fixed interval of time between the uses of such instrumentalities in the two. Why cannot an "engine" or "car," as much so as fixtures, in fact be devoted regularly to interstate transportation? Then wherein is the difference? The difference is only that, as to cars and engines, which are ambulatory, the proof in each case must affirmatively show that the "car" or "engine" has connection with, or is regularly used in, "interstate" transportation, and not "exclusively" used in "intrastate" transportation generally nor specially on the occasion at the given time of" "the injury" in suit. When that question is settled, then the case here is settled. Then the engine being regularly used in interstate transportation, as here, the placing of the engine in the roundhouse for repairs upon completion of the particular round trip on the road would not, it is thought, legally operate to withdraw it from any relation to, or connection with, interstate commerce. Repair of a bridge or track does not operate to withdraw it from interstate commerce. And if, as it was, the engine was connected with, or regularly used in, transportation of interstate commerce at the given time it was placed in the roundhouse for repairs, then, it is believed, neither the fact that a roundhouse was the place selected for the repairing, nor the length of time here shown required for the repairs, can change the legal situation.

In these views, I conclude that the judgment should be affirmed..