## MISSOURI-KANSAS-TEXAS R. CO. v. NORTHERN OKLAHOMA RYS. et al.

Circuit Court of Appeals, Eighth Circuit.
March 27, 1928.

### No. 7913.

**1. Commerce ⟨key⟩27(2)—Effect on interstate commerce of new construction determines necessity of procuring certificate of convenience and necessity from Interstate Commerce Commission (Transportation Act 1920, § 402, par. 18 [49 USCA § 1, par. 18]).**

Effect on interstate commerce of new construction within a single state by a new and separate railroad corporation determines whether certificate of necessity and convenience must be obtained from Interstate Commerce Commission, under Transportation Act 1920, § 402, par. 18 (49 USCA § 1, par. 18; Comp. St. § 8563, par. 18).

**2. Commerce ⟨key⟩86—Railroad's application to Interstate Commerce Commission for certificate of convenience and necessity does not preclude claim that contemplated new construction is solely intrastate (Transportation Act 1920, § 402, par. 18 [49 USCA § 1, par. 18]).**

Railroad is not estopped from contending that contemplated new construction is solely intrastate, because it has previously applied to Interstate Commerce Commission for certificate of public convenience and necessity, under Transportation Act 1920, § 402, par. 18 (49 USCA § 1, par. 18; Comp. St. § 8563, par. 18), nor is such application necessarily even an admission that the road is to be interstate.

**3. Commerce ⟨key⟩27(2)—Proposed railroad within single state, expected to transport commodities destined for other states, held required to obtain certificate of convenience and necessity from Interstate Commerce Commission (Transportation Act 1920, § 402, par. 18 [49 USCA § 1, par. 18]).**

Where evidence showed that portions of coal and other commodities expected to be hauled over contemplated railroad 10 to 15 miles long, within single state, between coal field and town through which two interstate railroads passed, would be destined to markets in other states, and that haul from origin to final destination would be continuous, held, such traffic would be purely interstate in character, and railroad would be an instrumentality of interstate commerce, within Transportation Act

1920, § 402, par. 18 (49 USCA § 1, par. 18; Comp. St. § 8563, par. 18), necessitating obtaining certificate of necessity and convenience from Interstate Commerce Commission, irrespective of the knowledge, intention, practice, or methods of handling or of billing by any carrier taking part therein.

Appeal from the District Court of the United States for the Northern District of Oklahoma; Franklin E. Kennamer, Judge.

Suit by the Missouri-Kansas-Texas Railroad Company against the Northern Oklahoma Railways and others. From a decree of dismissal without prejudice, plaintiff appeals. Reversed, with instructions.

Maurice D. Green, of Muskogee, Okl. (Joseph M. Bryson and Charles S. Burg, both of St. Louis, Mo., and John E. M. Taylor, of Muskogee, Okl., on the brief), for appellant.

Guy Patten, of Vinita, Okl. (W. J. Holloway and J. Berry King, both of Oklahoma City, Okl., on the brief), for appellees.

Before STONE and VAN VALKENBURGH, Circuit Judges, and KENNEDY, District Judge.

STONE, Circuit Judge. Appellant is an interstate railroad running through Vinita, Oklahoma. The corporate appellee is an Oklahoma corporation empowered to build and operate a standard gauge railroad "to transport freight, passengers, mail and express over said line of railway and to receive compensation therefor." The individual appellees are persons undertaking to construct the above line of railroad. The contemplated road is to begin near the right of way of the St. Louis-San Francisco Railway Company at a small station, Nemo, about three miles from Vinita, and to extend 10 or 11 miles to some coal fields. This action is to enjoin such construction on the ground that no certificate of necessity or convenience (under section 402, par. 18, Transportation Act of 1920 [49 USCA § 1, par. 18; Comp. St. § 8563, par. 18]) has been obtained from the Interstate Commerce Commission. Upon motion, after hearing the evidence for the plaintiff, the trial court dismissed the bill "without prejudice" upon the grounds "that the plaintiff's evidence is insufficient to prove that the defendant railroad when constructed will engage in interstate commerce, or that the railroad proposed to be constructed by the defendants was such a road as to bring it within the provisions of the Transportation Act of February 28, 1920 [49 USCA § 71 et seq.; Comp. St. § 10071¼ et seq.]. The court is of the opinion under the evidence

introduced that the contemplated railroad is one to be used only in intrastate commerce." From that decree, plaintiff brings this appeal.

The appeal presents the sole question of whether section 402, par. 18, of the Transportation Act of 1920 (41 Stat. 456, 477), is applicable to the facts shown by this evidence. To answer this question, it is necessary, first, somewhat to define the scope of that section and, second, to examine the facts in the light of such definition.

This section is part of an extended and comprehensive act which "introduced into the federal legislation a new railroad policy." New England Divisions Case, 261 U. S. 184, 189, 43 S. Ct. 270, 273 (67 L. Ed. 605); R. R. Comm. v. C., B. & Q. R. R. Co., 257 U. S. 563, 585, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. The purpose of this policy is repeatedly expressed in the act (sections 402, 407, 422 [49 USCA §§ 1, 5, 15a; Comp. St. §§ 8563, 8567, 8583a]) and may be stated in the language used in section 402 as being to "best promote the service in the interest of the public and the commerce of the people." An important feature of the means to accomplish such purpose was "affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country" (Dayton-Goose Creek Ry. v. United States, 263 U. S. 456, 478, 44 S. Ct. 169, 172 [68 L. Ed. 388, 33 A. L. R. 472]) so as "to insure * * * adequate transportation service" (New England Divisions Case, 261 U. S. 184, 189, 43 S. Ct. 270, 273 [67 L. Ed. 605]).

Probably the most important novel features of the act are the provisions designed to build up such an adequate system of railways. Those provisions have to do with railway capitalization, loans, consolidations, support of weak roads, common use of terminals, distribution of equipment and other matters. Belonging to the same class is the provision here involved. It deals "primarily with rights sought to be exercised by the carrier" (Cleveland, C., C. & St. L. Ry. Co. v. United States [U. S. Sup. Ill.] 48 S. Ct. 189, decided January 3, 1928) concerning its trackage. It applies to all mileage "used in interstate commerce" (Colorado v. United States, 271 U. S. 153, 164, 46 S. Ct. 452, 454 [70 L. Ed. 878]) except "spur, industrial, team, switching or side tracks located or to be located wholly within one state or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation" (section 402, par. 22, 41 Stat.

478 [49 USCA § 1, par. 22; Comp. St. § 8563, par. 22]; also see Colorado v. United States, 271 U. S. 153, 164, 46 S. Ct. 452, 70 L. Ed. 878). With the above exceptions, it comprehensively covers increase or decrease of *mileage used* in interstate commerce by providing for abandonment, extension, acquisition or new construction of such mileage. It is as follows (41 Stat. 477):

"After ninety days after this paragraph takes effect no carrier by railroad subject to this act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

[1] Because interstate carriers are almost always also intrastate carriers it is natural that questions involving construction of this paragraph should arise in connection with the abandonment, extension or new construction of trackage located entirely within one state. Cases involving abandonment (Texas v. Eastern Texas R. R. Co., 258 U. S. 204, 42 S. Ct. 281, 66 L. Ed. 566; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878) and extensions (Texas & Pac. Ry. v. Gulf, etc., Ry., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578; R. R. Comm. v. Atchison, T. & S. F. R. Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713) of trackage located wholly in one state have been before the Supreme Court. Also a case (El Dorado & W. Ry. Co. v. C., R. I. & P. Ry. Co. [C. C. A.] 5 F.[2d] 777) in this court involving extension. These cases settle that the element of single state trackage is not determinative. The two cases involving abandonment define the limits of the paragraph in its influence upon intrastate operation. The Colorado Case holds that all intrastate operation may be abandoned where it constitutes a burden upon interstate commerce which would, in the judgment of the Commission, outweigh the necessity and convenience of its contin-

ued maintenance. In that case, the abandoned line was part of but not physically connected with the railroad system seeking the relief. The Texas & Eastern Case was of a short line (30 miles) separately owned and operated. In that case, it was held the Commission might order discontinuance of interstate business but not of intrastate business because the latter could be continued without affecting interstate commerce. We think the effect of these two cases is that the character of business (interstate) determines the right to control under this paragraph. We see no reason why the same rule should not apply as to new construction. New construction by an existing carrier might prejudicially affect the public by financially hampering that carrier in performing its function in furnishing an adequate interstate service to the public; by invading the territory already adequately served by another interstate carrier and thus injuring one or both of them; by causing an increase in the group rates or by other ways. Such new construction by a separate new corporation might have all of the above results. The Transportation Act is intended to cover new construction by a corporation not existing at the time the act was passed (section 422, being section 15a (18) [49 USCA § 15a, par. 18; Comp. St. § 8583a, par. 18]).

With the above construction of the scope of this paragraph as to control over new construction, we pass to the matter of whether the road here contemplated will be an interstate carrier and, therefore, within the scope of the paragraph so that it must have a certificate from the Commission before it can be built. Appellees, properly, expressly disavow sole reliance either upon the fact that the entire mileage will be in Oklahoma or upon any form of billing the freight thereover. They plant themselves upon the proposition that they do not intend to and will not do any but an intrastate business over this single state trackage. They say:

"That the proposed road will start and end in Craig county, Oklahoma, and will be built and paid for, except for a local bonus, out of the private means of appellees. That no other railroad has or will have any interest in it. That it will be operated exclusively by themselves. That they do not have and will not have any arrangement with any other railroad for the operation of the proposed road. That they do not have and will not have any arrangement with any other road for interchange of traffic. That their purpose is to haul coal and other commodities to town, where the owner of such commodity so

hauled will have his commodity at market where he can do with it as he pleases. That the proposed road will charge for its own service only, and will have no interest whatever in what is done with the commodity when it has placed it on its storage tracks. That it will not participate in any division of rates beyond its own road, should the commodity be carried farther by some other road, nor be a party in any form or manner to any through billing, either incoming or outgoing."

They claim that this is what the evidence shows is to happen and conclusively proves that the road and its operation is to be purely and solely intrastate.

[2] There is no substantial conflict in the evidence. Application for a license (under section 402, par. 18) to construct this same road has been presented by appellees to the Interstate Commerce Commission and denied. This application does not estop appellees from contending that the now contemplated construction and operation is to be solely intrastate nor is it necessarily even an admission that the road is to be interstate. Texas & Pac. Ry. v. Gulf, etc., Ry., 270 U. S. 266, 273, 46 S. Ct. 263, 70 L. Ed. 578. We dismiss that proceeding from consideration except in so far as evidence before the Commission and also introduced in this action may bear, as evidence, upon the interstate or intrastate character of the road.

Vinita, county seat of Craig county, is a town of about 5,000 people. It is served by the Missouri-Kansas-Texas and the Frisco Railroads—both important interstate carriers. Beginning about seven miles north and west of Vinita there is a tested and proven coal field extending north and northwestward for some miles and from two to four miles wide. At present, mining of this coal is confined to such as can be brought to Vinita in wagons and trucks and sold for consumption there. The contemplated plan has, for its main purpose, the transportation of this coal in car load lots to Vinita. Because of the expense of right of way into and through Vinita, it is planned to have the southern terminus of the new road adjoin the Frisco tracks at a small station, Nemo, about three miles west of Vinita; from which place the freight will be brought into Vinita over the Frisco tracks, under some trackage arrangement which has not been made, but which the Frisco officials intimate their willingness to consummate. At Vinita, the loaded cars are to be placed on storage tracks, to belong to the new road, or are to be transported further on the Frisco. Apparently,

also, track connections with the Missouri-Kansas-Texas will be sought at Vinita so that freight may go further on that line. From Nemo, the line is to run some ten or eleven miles, going up through and terminating in these coal fields where there is no town or railroad connection. This coal is expected to furnish about 90 per centum of the tonnage—the balance being mainly stock, hay and agricultural products.

The persons in the plan are all citizens of Vinita and no others are interested therein. A portion of the necessary capital is to be raised by a bonus from the people of Vinita. The bonus agreement sets out that the construction of the road is subject to certain conditions precedent—one of these is that reliable coal operators will contract to produce "not less than 2,000 tons of coal per day for an average of 200 working days in the year" from the above coal fields; and another is the obtaining from the Frisco of "satisfactory trackage arrangements from their point of contact into the city of Vinita."

Oklahoma has much unmined coal and many operators. During the past few years these mines have run much under capacity because of lack of market and appellees expressly concede that "the larger percentage of the coal mined in Oklahoma is marketed outside of the state." One of the promoters testified that:

"Some of the coal produced along the line will be shipped north and northeast, and some of it will go south down in Houston, Fort Worth and Dallas, possibly. It will be up to the operators to work out their districts, territory. They will market the coal where they have been marketing it for the last 25 or 30 years; that would be Kansas City, St. Louis, St. Jo, Carthage, Omaha. About 90 per cent. of our tonnage will be coal."

There is no intention that cars loaded with coal from these mines shall be reloaded at Vinita or Nemo if the shipper intends them to go to any other market.

The purposes and methods of operation of the new road are revealed in extracts from the testimony of two witnesses. M. E. Gaskill, originator and promoter of the plan and one of the appellees, testified as follows:

"Q. Now, this proposed railroad, Northern Oklahoma Railways, I believe it is called, is to run, as I understand, from a point near Vinita northwest in Craig county some ten or fifteen miles?

"A. Yes, sir.

"Q. What is the purpose of the construction of that road?

"A. Primarily to develop and transport coal from what is commonly known as the Craig county coal field.

"Q. To transport it where?

"A. Transport it down to where it can be placed on a railroad other than our own.

"Q. On some other railroad at Vinita?

"A. Yes, sir.

"Q. And for that purpose do you intend—

"A. Either there or to be sold in Vinita itself. Simply to transport it out of the field to a place where it can be handled.

"Q. To be handled where, any particular place?

"A. Wherever the owner of the coal sees fit.

"Q. Whether it be within the state of Oklahoma or some other state?

"A. Well, that is a matter for the owner of the coal to determine.

"Q. In other words, what I was getting at, you propose to accept, do you, any and all coal which may be offered you at the terminus of your road in the Craig county coal field?

"A. Yes, sir; we propose to accept the coal produced by any of the operators in that territory.

"Q. Regardless of where these operators might desire to ultimately destine the coal?

"A. We are not concerned about that.

"Q. You wouldn't in other words refuse some shipment because the operator has sold it in Kansas or Missouri and was trying to get it up there?

"A. We wouldn't refuse to haul it down to Vinita.

"Q. In other words, if a shipper should come to you and say I have a car of coal, or so many cars of coal, which I have sold, or which I want to have transported to Kansas City or St. Louis or any other point out of the state of Oklahoma, you would accept such coal and transport it for him as far as Vinita?

"A. Not as a part of his entire shipment.

"Q. Well, pardon me, Mr. Gaskill, that might be a question of law, but you would accept it and bring it to Vinita as I understand?

"A. We would not be concerned to where he was going to ship this coal, whether it was out of the state or not. We would accept the shipment down to Vinita only.

"Q. And there the purpose of having trackage connection with some other railroad would be to deliver the coal by making it possible for the other railroad to get hold of it?

"A. Make it possible for the shipper to do as he saw fit with it.

"Q. And send it on out of Oklahoma if he saw fit?

"A. We would not be concerned with that.

"Q. You wouldn't try to foreclose him from doing that?

"A. It wouldn't be any of our business.

"Q. So that you would deliver the coal if he desired it to whatever road you had trackage connection with?

"A. No, sir; I wouldn't say we would deliver it to another road. We would deliver it to the end of our line where if he wanted another road to pick it up he could do so.

"Q. Yes, sir; and what other commodity do you expect to handle besides coal?

"A. Well, we expected to handle whatever might be put there in the way of products of the country, live stock, that we could haul as a part of our business down to the end of the line.

"Q. In fact you would accept, I take it, any commodity tendered you in proper condition for shipment and handle it to the end of your line?

"A. Yes, sir.

"Q. And if the shipper wanted it to go further you would put it in position where some other road could get it and carry it further?

"A. We would put it at the end of our line.

"Q. At Vinita?

"A. Yes, sir.

"Q. Now, your bonus contract says you propose to have a trackage connection with the Frisco. What is the purpose of that trackage connection?

"A. It says we propose to have a trackage connection?

"Q. I say your bonus contract, which I have just read, with the citizens of Vinita, says you propose to connect up with the Frisco at a place near Nemo, which I understand is an old switch about three miles out of Vinita.

"A. We expect to ask the Frisco to give us a connection.

"Q. Now, what is the purpose of that connection?

"A. So that the products that we haul down to the end of our line may move from there at the discretion of the owner of them.

"Q. Now, what are your plans and what do you propose to do with reference to billing shipments which originate on your road, as to whether you would issue a through bill of lading or only to Vinita in every case?

"A. We would have no bill of lading except as applied to our own lines. Would not be interested in through bills of lading to any other point, other than the end of our line.

"Q. What do you intend to do with reference to any shipment which might come in over the Frisco or the Missouri-Kansas-Texas Railroad from points outside the state of Oklahoma, but destined to some point on your line?

"A. Refuse to accept it.

"Q. Under any and all circumstances?

"A. On a through bill of lading; yes, sir.

"Q. Well, then you would accept them under certain conditions?

"A. Only upon their terminating at Vinita. Then if the shipper desired to send them out somewhere on our line he would have to have a separate arrangement with us.

"Q. In other words all you would require of the shipper to make a new contract with you and pay you your freight charges?

"A. Yes, sir.

"Q. But you would take the shipment to destination under those conditions?

"A. We would take the commodity; yes, sir.

"Q. In other words, Mr. Gaskill, you don't propose to just refuse anything that is offered but intend to accept under certain conditions as you have outlined every commodity properly offered you for shipment?

"A. If it is offered to us without any connection to any other shipment.

"Q. Regardless of whether it started on a journey in some other state or regardless when it started on its journey on your road the shipper intended to have the ultimate destination in some other state?

"A. We would not confine ourselves or be interested in where the shipment started. We would only be concerned when it was billed on our road at the end of our line.

"Q. And you would not concern yourself either with the ultimate destination of the shipment further than to get it to the end of your line?

"A. Yes, sir; to the end of our line is all we are concerned with."

The same witness further testified as follows:

"Q. You propose to have a standard railroad including stations and all equipment of an ordinary railroad?

"A. Well, possibly that would be putting it too broad to say all the equipment of an ordinary railroad. We expect to have such equipment as will be necessary for the operation of our little road.

"Q. To handle whatever business that comes to it under the conditions I have already named?

"A. Yes, sir; we expect to have sufficient equipment in the way of power and trackage to handle the business.

"Q. Now, then, what plans and what arrangements have been made, if any, for power and for cars?

"A. We have one locomotive that we expect to use and will get another one, if it is necessary, and we expect to get sufficient cars to take care of our particular needs.

"Q. Now, where will you get those cars?

"A. Well, there are plenty of them on the market.

"Q. Your idea is to buy them rather than to lease from some other carrier?

"A. I don't mean to convey the impression that we would own sufficient number of cars to haul all the products of that territory, but we would own sufficient cars to take care of such business that would apply to our own local little hauls.

"Q. In other words, Mr. Gaskill, what I have particularly in mind is the transportation of 2,000 tons of coal per day for 200 days in the year. Have you calculated about how many coal cars that would take; or railroad cars?

"A. I hardly think that we would own that many cars.

"Q. Then would you or not expect to lease them or make some other arrangements with other carriers to furnish them, or under some legal procedure require some other carrier to furnish them?

"A. I would expect when we needed more cars than we had, that is a matter for the shipper. He would ask the Frisco to set out on our storage track a car for him. We would take that car up our line, load it and bring it back.

"Q. In other words, if your business justified and required it you would expect to receive equipment like cars from other roads, and deliver your equipment and cars to other roads in the business of a common carrier?

"A. I would expect, yes sir, to use cars that didn't belong to our road. That is, I wouldn't use them, my shipper would.

"Q. You wouldn't, in other words, require a coal operator to unload one of your cars at Vinita and release the equipment?

"A. Well, that is a matter of his business, not mine.

"Q. You wouldn't make him do that if he didn't want to?

"A. I wouldn't have any reason to say whether he should or not. Wouldn't be any of my business."

Guy Patten, president of the new company, a promoter of the plan and an appellee, testified as follows:

"Q. What is the purpose of the construction of this railroad?

"A. In order to furnish rail facilities from or near Vinita up to about the center of the Craig county coal fields in order that coal miners and coal operators may be able to open up those coal mines and produce coal and get it down to or near Vinita, the purpose being—heretofore it has been utterly impossible to mine coal out there on account of the cost of hauling it to town by wagon or truck. This railroad is being built to furnish cheaper transportation to that industry down to Vinita.

"Q. What is the extent of the coal operation out there now and for the last three or four years?

"A. Not only for the last three or four years, but for years and years, the coal mining operations are very small and limited entirely to just small output of a 'little mine here and there, such as can be sold locally and hauled into town with a wagon or truck. There is no coal I know of that can be produced cheap enough and hauled into town cheap enough to ship by a railroad.

"Q. Who are the principal coal operators who have leased or own coal coal lands out there now which might be served by this proposed road?

"A. Well, there is the Craig County Coal Company, they have some stuff out there, and I have been trying to run a little shaft mine and a fellow named Baxter has blocked up five or six hundred acres of very good coal land out there. Oh, I don't know, I can't name them all.

"Q. Are there any larger companies?

"A. Of course the Hartford Valley Coal Company a few years ago leased a large amount of land up there, and Mr. Spencer has some land up there, I don't know just where his land is, and I think Robinson & Coleman, of Miami, have some land up in that country. They bought in fee coal land and drilled it.

"Q. How about the Central Coal & Coke Company?

"A. Beyond the proposed north terminus of this road the Central Coal & Coke Company have bought the coal rights in fee and paid for them on approximately I think about 20,000 acres after having drilled it up.

"Q. Would you expect to haul coal for these larger companies you have mentioned?

"A. We would haul it for anybody that wanted us to haul it.

"Q. And found it practical to mine and deliver to you?

"A. Anybody that will mine coal up there we will haul it for them down to Vinita.

"Q. In fact, as Mr. Gaskill says, you will haul any commodity offered to you on your own conditions?

"A. Yes, sir.

"Q. What will be the purpose of bringing this coal or any other commodity to Vinita?

"A. Vinita is located at the junction of Railroad Company and we are assuming the main line of the Frisco and the M.-K.-T. that Vinita is so located with reference to railroad service that it ought to be very easy to make out of it a very good distributing point for any commodity, and there is no way to get this resource developed except by some cheap rail transportation that will bring it to town, and we are building this road for the purpose of bringing that coal, that will be the principal thing, we are building this road for the purpose of offering cheap transportation from those coal fields to Vinita. When a shipper gets his coal to Vinita he is like a man with a wagon load of wheat, he has got it to town where he can do something with it.

"Q. Suppose the shipper wanted to transport it from your line in Craig county to Kansas City, would you refuse to bring it to Vinita for him?

"A. We have never intended to have any arrangement by which we can negotiate any such haul as that. What we will do is build this track down to Vinita or near Vinita and at the end of our track we will have a storage track and we will haul his commodity and place it on our storage track, and then we will ask any railroad company, your company or the Frisco or both, and expect them to do it as a matter of right under the law, give us interchange or switch track connection to that storage track. In other words we are not trying to be railroad men. We are trying simply to confine our business to a purely local haul in that one community.

"Q. What would be the purpose of getting a track connection with the Frisco or Katy at Vinita?

"A. In order that anything we might perform the service of hauling for the shipper when he got it there if he wanted to get the Frisco or Katy Railroad Company to take that off of our storage track and ship it some place else he could get it over on a railroad so he would not have to unload it.

"Q. In other words, if you received a

carload of coal or anything else on your line and you knew either by what the shipper had told you or otherwise that the ultimate destination of the shipment as intended by him was for some point outside of the state of Oklahoma, you would still, as I understand it, accept the shipment and haul it to Vinita and place it on one of our tracks in position where he could have it transported to the other road and carried on to destination?

"A. In effect, yes, sir. In the spirit in which you ask the question, no. We will do what I said awhile ago; we would not be concerned in where he was gong to ship his coal. Of course, imagining a case in case he wanted to tell us for no reason on earth what he was gong to do, I don't suppose we would be small enough to turn the shipment down for that reason.

"Q. In other words, if I should come to you up there, this is stretching your imagination pretty far, and tell you I had a carload of coal that I had secured at the terminus of your line and had sold it to some party in Kansas City, Missouri, and was transporting it up there, would you help me out in hauling it part of the way?

"A. I don't know why any shipper should go to the pains of coming to me and telling me that.

"Q. Well, if I did?

"A. I would tell him like we would everybody else; we would haul it to Vinita; we are not concerned with where he was sending it.

"Q. In other words, you wouldn't propose to refuse to haul any commodity?

"A. We are building this road to haul everything we can haul on it down to Vinita and there our interest in that stops.

"Q. But if the shipper wants it to go further you will put it in position where, after you get this trackage connection?

"A. We will put it on our storage track and if he can get your railroad or the Frisco to take it from there that is his business.

"Q. How would you manage the matter of waybilling?

"A. Just charge for hauling on our own road, both incoming and outgoing stuff; use our own bill of lading. We wouldn't issue any through bills of lading.

"Q. What do you propose to do with reference to complying with either state or federal law requiring filing tariff rates?

"A. Well, so far as filing any tariff rates under the federal law we don't expect to file any, and so far as filing any tariff rates in the state from a point on our line to a point within the state of Oklahoma, of course, if the Corporation Commission requires us to do it we will do it, but we don't want to do that. We want to confine our business entirely to that track of ours.

"Q. If a commodity should come in over the Frisco or Katy from some point outside of the state of Oklahoma billed and destined to some point on your road, would you handle that under any conditions, and if so, under what conditions?

"A. We wouldn't handle it under any such billing as that. The only condition under which we propose to handle anything coming in, whether it comes from a point within the state of Oklahoma or from a point without the state of Oklahoma, is that the shipper when he gets his commodity to Vinita if he will have it placed on our storage track and comes to us and make arrangement we will haul it where he wants it on our road, irrespective of where it comes from.

"Q. What do you mean by making his own arrangement with you?

"A. I mean a contract limited entirely to our road.

"Q. In other words you would require of him the issuance of new waybills and bills of lading strictly on your road?

"A. We would consider a car placed on our storage track in the same light exactly as a fellow who brought a case of goods and placed it on the freight house platform.

"Q. And regardless of where it came from?

"A. We would not be interested in where it came from.

"Q. Mr. Patten, are you familiar in a general way with the coal situation in Oklahoma?

"A. I cannot say that I am; no, sir.

"Q. Do you know whether or not it is a fact it will be possible to market in the state of Oklahoma the quantity of coal called for to be produced as mentioned in your bonus contract?

"A. I don't know whether it will or not. I assume that some of this coal will be shipped by the owners outside of the state of Oklahoma."

The evidence as to state or interstate traffic (other than coal) which this road would carry is by a farmer and cattleman, Jack Montgomery, who estimated that from 7,000 to 8,000 head of cattle were handled in tributary territory and he said: "I ship my cattle to Kansas City and St. Louis." [3] From all of this evidence it is clear that the new road would be a common carrier; that practically all of its contemplated or

possible tonnage would pass, as originally loaded, beyond Vinita over the Frisco or Missouri-Kansas-Texas; that much of it would go out of the state; that such freight would, when started, be destined by the shipper to such markets in other states; and that the haul would, from origin to final destination, be continuous. However much the appellees may intend to and try to ignore and avoid it, the situation is clear to them, as it is to us, that the new road will function and could not exist without functioning as the initial carrier of freight passing in continuous journey from the point of origin on its line to destinations beyond the state. Such traffic is purely interstate in character and the character of the shipment determines the character of the carrier. It is beyond the power of the shipper (Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828; C., M. & St. P. Ry. v. Iowa, 233 U. S. 334, 343, 34 S. Ct. 592, 58 L. Ed. 988) or of the carrier (B. & O. S. W. R. R. Co. v. Settle, 260 U. S. 166, 170, 43 S. Ct. 28, 67 L. Ed. 189; Baer Bros. Mer. Co. v. D. & R. G. R. R. Co., 233 U. S. 479, 490, 34 S. Ct. 641, 58 L. Ed. 1055) to change that character. The origin and true and actual destination with its continuous path of travel between is governing. Champlain Co. v. Brattleboro, 260 U. S. 366, 376, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Western Union Tel. Co. v. Speight, 254 U. S. 17, 41 S. Ct. 11, 65 L. Ed. 104; Arkadelphia Co. v. St. L., etc., Ry., 249 U. S. 134, 151, 39 S. Ct. 237, 63 L. Ed. 517; Western Union Tel. Co. v. Foster, 247 U. S. 105, 113, 38 S. Ct. 438, 62 L. Ed. 1006, 1 A. L. R. 1278; Penn. R. R. v. Sonman Shaft Coal Co., 242 U. S. 120, 122, 37 S. Ct. 46, 61 L. Ed. 188; C., R. I. & P. Ry. v. Wright, 239 U. S. 548, 550, 36 S. Ct. 185, 60 L. Ed. 431; Penn. R. R. v. Clark Coal Co., 238 U. S. 456, 466, 35 S. Ct. 896, 59 L. Ed. 1406; Kirmeyer v. Kansas, 236 U. S. 568, 35 S. Ct. 419, 59 L. Ed. 721; Heyman v. Hays, 236 U. S. 179, 35 S. Ct. 403, 59 L. Ed. 527; Bacon v. Illinois, 227 U. S. 504, 513, 33 S. Ct. 299, 57 L. Ed. 615; N. Pac. Ry. v. Washington, 222 U. S. 370, 375, 32 S. Ct. 160, 56 L. Ed. 237. When a car of coal or cattle starts from these mines or farms destined by the shipper for a continuous haul to a market outside the state of origin it is an interstate shipment irrespective of the knowledge, intentions, practices or methods of handling or of billing by any carrier which takes part in that haul. As said in Western Oil Ref. Co. v. Lipscomb, 244 U. S. 346, at page 349, 37 S. Ct. 623, 624 (61 L. Ed. 1181):

"Ordinarily the question whether particular commerce is interstate or intrastate is determined by what is actually done and not by any mere billing or plurality of carriers, and where commodities are in fact destined from one state to another a rebilling or reshipment en route does not of itself break the continuity of the movement or require that any part be classified differently from the remainder. As this court often has said, it is the essential character of the commerce, not the accident of local or through bills of lading, that is decisive. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498 [31 S. Ct. 279, 55 L. Ed. 310]; Ohio Railroad Commission v. Worthington, 225 U. S. 101 [32 S. Ct. 653, 56 L. Ed. 1004]; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111 [33 S. Ct. 229, 57 L. Ed. 442]; Louisiana Railroad Commission v. Texas & Pacific Ry. Co., 229 U. S. 336 [33 S. Ct. 837, 57 L. Ed. 1215]; Chicago, Milwaukee & St. Paul Ry. Co. v. Iowa, 233 U. S. 334, 343 [34 S. Ct. 592, 58 L. Ed. 988]; South Covington & Cincinnati Street Ry. Co. v. Covington, 235 U. S. 537, 545 [35 S. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792]."

As said in Ill. Cent. R. R. v. De Fuentes, 236 U. S. 157, 163, 35 S. Ct. 275, 276 (59 L. Ed. 517):

"When freight actually starts in the course of transportation from one state to another it becomes a part of interstate commerce. The essential nature of the movement and not the form of the bill of lading determines the character of the commerce involved. And generally when this interstate character has been acquired it continues at least until the load reaches the point where the parties originally intended that the movement should finally end. McNeill v. Southern Railway, 202 U. S. 543, 559 [26 S. Ct. 722, 50 L. Ed. 1142]; Southern Pacific Terminal v. Interstate Commerce Commission, 219 U. S. 498, 527 [31 S. Ct. 279, 55 L. Ed. 310]; Ohio Railroad Commission v. Worthington, 225 U. S. 101, 110 [32 S. Ct. 653, 56 L. Ed. 1004]; Texas & New Orleans Railroad v. Sabine Tram Co., 227 U. S. 111, 126 [33 S. Ct. 229, 57 L. Ed. 442]; Louisiana Railroad Commission v. Tex. & Pac. Ry., 229 U. S. 336, 341 [33 S. Ct. 837, 57 L. Ed. 1215]."

Again, as said in Texas & N. O. R. R. v. Sabine Tram Co., 227 U. S. 111, 123, 33 S. Ct. 229, 233 (57 L. Ed. 442):

"We have had occasion to express at what point of time a shipment of goods may be ascribed to interstate or foreign commerce and

decided it to be when the goods have actually started for their destination in another state or to a foreign country, or delivered to a carrier for transportation. Coe v. Errol, 116 U. S. 517 [6 S. Ct. 475, 29 L. Ed. 715]; Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 527 [31 S. Ct. 279, 55 L. Ed. 310]."

Again, in B. & O. S. W. R. R. Co. v. Settle, 260 U. S. 166, 170, 43 S. Ct. 28, 30 (67 L. Ed. 189), it was said:

"And whether the interstate or the intrastate tariff is applicable depends upon the essential character of the movement. That the contract between shipper and carrier does not necessarily determine the character was settled by a series of cases in which the subject received much consideration. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498 [31 S. Ct. 279, 55 L. Ed. 310]; Ohio Railroad Commission v. Worthington, 225 U. S. 101 [32 S. Ct. 653, 56 L. Ed. 1004]; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U. S. 111 [33 S. Ct. 229, 57 L. Ed. 442]; Railroad Commission of Louisiana v. Texas & Pacific Ry. Co., 229 U. S. 336 [33 S. Ct. 837, 57 L. Ed. 1215]. And in Baer Brothers Mercantile Co. v. Denver & Rio Grande R. R. Co., 233 U. S. 479, 490 [34 S. Ct. 641, 58 L. Ed. 1055], this court held that a carrier cannot, by separating the rate into its component parts, charging local rates and issuing local waybills, convert an interstate shipment into intrastate transportation, and thereby deprive a shipper of the benefit of an appropriate rate for a through interstate movement."

Also see Atlantic Coast Line R. R. Co. v. Standard Oil Co. (U. S. Sup. Ky.) 48 S. Ct. 107, decided Nov. 28, 1927; Penn. R. R. Co. v. Sonman Shaft Coal Co., 242 U. S. 120, 37 S. Ct. 46, 61 L. Ed. 188; A. & T. Ry. v. Harold, 241 U. S. 371, 376, 36 S. Ct. 665, 60 L. Ed. 1050; Penn. R. R. v. Clark Coal Co., 238 U. S. 456, 466, 35 S. Ct. 896, 59 L. Ed. 1406; Ill. Cent. R. R. v. De Fuentes, 236 U. S. 157, 163, 35 S. Ct. 275, 59 L. Ed. 517; South Covington Ry. v. Covington, 235 U. S. 537, 545, 35 S. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792; Baer

Bros. v. D. & R. G. R. R., 233 U. S. 478, 490, 34 S. Ct. 641, 58 L. Ed. 1055; C., M. & St. P. Ry. v. Iowa, 233 U. S. 334, 343, 34 S. Ct. 592, 58 L. Ed. 988; St. L. S. F. Ry. v. Seale, 229 U. S. 156, 161, 33 S. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914C, 156; United States v. Union Stock Yard, 226 U. S. 286, 304, 33 S. Ct. 83, 57 L. Ed. 226; Ohio R. R. Comm. v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004.

Since a portion of the traffic which this new road will transport is interstate traffic; since a railroad which takes any part in transporting interstate traffic is an instrumentality of interstate commerce; since "the authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on" (Minn. Rate Cases, 230 U. S. 352, 399, 33 S. Ct. 729, 737, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18) and since Congress has, in section 402, par. 18, declared its rules of control as to new construc-* tion of interstate commerce instrumentalities, this road could not be constructed without compliance with that statutory provision.

This is not an instance where a contemplated railroad actually does not intend to handle and will not transport any freight moving in interstate commerce. If it were such, it would come within Texas v. Eastern Texas R. Co., 258 U. S. 204, 42 S. Ct. 281, 66 L. Ed. 566. On the contrary, it is clear that a large part of this traffic must be interstate. The facts here place this case more within the reasoning of Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878.

Because we think this case is determined by the fact that this road would (because of the character of traffic to be handled) be an interstate carrier, we find it unnecessary to determine or examine the further contention by appellant that the Constitution of Oklahoma (article 9, § 3) would compel this road to carry all freight offered it and, therefore, could not avoid being an interstate carrier.

The result is that the trial court was in error in dismissing the bill and that the decree should be reversed with instructions to proceed in accordance with this opinion.